Law Office of
**HERNANDEZ & HAMILTON, PC**
The Johnson House Offices
455 West Paseo Redondo
Tucson, Arizona 85701-8254
JOSHUA F. HAMILTON (AZ028084)
Email: _Josh@Hernandez-Hamilton.com_
Telephone: (520) 882-8823
Fax: (520) 882-8414
Attorney for Defendant

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br>　　　　　　　Plaintiff,<br><br>　　vs.<br><br>Jordan Thomas Udall,<br>　　　　　　　Defendant. | No. 22-CR-00984-RM-1<br><br>**DEFENDANT'S SENTENCING MEMORANDUM** |

  The defendant, through his attorney, hereby recommends a sentence in this matter of **24 months imprisonment followed by lifetime supervised release** with sex offender conditions.  This recommendation is supported by the accompanying memorandum of points and authorities.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

  Jordan Udall pled guilty to an Information charging a single count of knowing access with intent to view child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B), (b)(2).  His Rule 11(c)(1)(C) plea agreement allows for a prison sentence of 24-48 months followed by a mandatory lifetime term of supervised

release.  He also will be required to register as a sex offender pursuant to Arizona law.  *See* A.R.S. § 13-3821(A)(13).

The draft PSR calculates a base offense level of 18, plus a 2-level enhancement under USSG §2G2.2(b)(2) because the material involved prepubescent minors; a 2-level enhancement under §2G2.2(b)(3)(F) because the offense involved "knowing" distribution; a 2-level enhancement under §2G2.2(b)(6) for use of a computer; a 5-level enhancement under §2G2.2(b)(7)(D) for involving 600 or more images; and a 3-level reduction under USSG §3E1.1 for acceptance of responsibility, for a **Total Offense Level of 29**.[1]  Mr. Udall has no prior criminal history, which places him in **Criminal History Category I**.

Based on these calculations, the PSR recommends a variant sentence of 36 months in prison followed by a lifetime term of supervised release.  Mr. Udall makes no excuses for his conduct in this case, and he is ashamed beyond words. However, significant mitigating factors justify the sentence recommended below.

## II.  BACKGROUND INFORMATION

### A. Personal History

Mr. Udall was born in Springerville, Arizona on July 26, 1978.  His parents were devout Mormons, and he was raised in a strict religious household in rural

---

[1]On November 9, 2022, Mr. Udall filed comprehensive objections to the draft PSR which outlined why several of its guideline calculations are improperly applied.  (Doc. 24.)  That filing is incorporated by reference hereto.

Arizona, where his father was a cattle rancher. He has five older siblings: Francelle (age 55), Wade (age 54), Nancy (53), Bowen (48), and Mandy (age 46).

Upon graduating from St. Johns High School in 1997, Mr. Udall went on his church mission for 2 years. He then briefly attended college in Utah where he met his wife, Katie, whom he married in 1999. They have four children together: Hailey (age 19), Cooper (age 17), Mattie (age 15), and Isaac (age 11). His family has remained supportive of him throughout the pendency of this case.

Mr. Udall has had outstanding careers in the military and as a mining engineer. *See infra.* He joined the Marine Corps in 2000 and was deployed as an infantryman in Iraq. He was awarded numerous medals and awards for his heroism.[2] Mr. Udall was honorably discharged from USMC in 2008 at the rank of sergeant (E-5). He worked as a police officer with the St. Johns Police Department before returning to school to become an engineer.

Mr. Udall went on to enroll full-time in courses at Northern Arizona University and obtained an engineering degree in 2013. Since obtaining his bachelor's degree, he has worked as a mining engineer, most notably with Freeport McMoRan (hereinafter, "Freeport"), where he is currently employed and has earned a healthy living for his family.

---

[2]*See* Exhibit A, attached hereto.

Mr. Udall's behavior since his arrest in January of 2019 has been exemplary. His good behavior speaks to the positive aspects of his character and is particularly relevant in considering an appropriate sentence in this case. Mr. Udall's entire life was understandably shattered by this case. He is poised to lose his cherished career with Freeport and faces a bleak future. A different individual may well have given up, but Mr. Udall did not. Instead, he has been working full-time to earn as much money as possible to support his family while he is in prison.

**B. Offense Conduct**

In November of 2018, agents with Homeland Security Investigations (HSI) utilized automated software designed to monitor internet traffic on the BitTorrent peer-to-peer (P2P) file-sharing network to determine that an IP address belonging to Mr. Udall was downloading suspected child pornography files. Agents obtained a search warrant for his home outside Thatcher, Arizona, where he lived with his family. Mr. Udall was cooperative with the agents during their search.

Subsequent forensic examination of Mr. Udall's electronic devices led to the discovery of fragments of deleted child pornography files in the unallocated hard drive space. Mr. Udall retained counsel undersigned and worked with the government to reach a preindictment plea agreement in this case. He pled guilty on May 9, 2022, and has been on pretrial services (PTS) supervision, with home detention and GPS ankle monitoring, ever since. Mr. Udall has performed

flawlessly on PTS pending sentencing, and counsel undersigned anticipates that PTS will file a progress report prior to sentencing which will detail the same.

## C. Steps Taken in Anticipation of Sentencing

The past four years have been especially difficult for Mr. Udall. In that time, he has gained real insight into his offense conduct—both as to what caused him to access the illicit content in the first place and the incredible damage it causes to the real-life victims who were harmed during its creation. He has submitted a heartfelt and insightful letter to the Court detailing his acceptance of responsibility. His guilty plea, which calls for a lengthy prison sentence with mandatory sex offender registration and lifetime supervised release, will allow him to take full advantage of all available treatment opportunities.

While Mr. Udall still has a long path to travel to achieve redemption, he feels very fortunate to now be on that path. The deep, dark secret that he carried around with him is finally out in the open, and he has now begun to meaningfully address it. The insight he has gained into the harm that viewing child pornography causes is a critical first step, but he still wants to better understand what led him to offend in the first place, as well as gather additional tools to ensure he never reoffends again. His main goals moving forward are getting treatment and making amends to his victims and his family. He plans to continue working upon release, and vows never to return to the criminal justice system.

## III. FEDERAL SENTENCING FRAMEWORK

### A. The Sentencing Calculus, Generally

This Court must follow the three-step process set forth *Gall v. United States*, 522 U.S. 38 (2007). *See also* USSG §1B1.1(a)-(c) (Application Instructions). First, it must determine the proper guideline range. Second, it must determine whether to apply any of the guidelines' departure policy statements to adjust the guideline range. Third, it must consider all factors set forth in 18 U.S.C. § 3553(a) and determine whether any variance is warranted. *United States v. Vasquez-Cruz*, 692 F.3d 1001, 1006 (9th Cir. 2012); *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (citation omitted).

### B. The *Advisory* Guidelines Range

Though the first step is to correctly calculate the guidelines, there is no presumption that the applicable range is reasonable, and the Court may vary from it based on policy disagreements. *See*, *e.g.*, *United States v. Henderson*, 649 F.3d 995, 963 (9th Cir. 2011), *citing Kimbrough v. United States*, 552 U.S. 85 (2007). In *Kimbrough*, the Supreme Court considered whether district courts could reject the 100-to-1 crack-to-powder disparity in cocaine cases. 522 U.S. at 91. The Court recognized that the federal sentencing guidelines are just that—*guidelines*— which judges remain free to deviate from due to their "greater familiarity with . . .

the individual case and the individual defendant before [them] than the [Sentencing] Commission or the appeals court." *Id.*

*Kimbrough* famously held that the now-defunct crack-to-powder guidelines "present[ed] no occasion for elaborative discussion of this matter because those guidelines do not exemplify the Commission's exercise of its characteristic institutional role." *Id.* In other words, the guidelines could not mandate certain sentences that were "greater than necessary" and thus in violation of the aims of 18 U.S.C. § 3553(a). *Id.* at 110. The Court ultimately determined "it would not be an abuse of discretion for a district court to conclude when sentencing a particular defendant that the crack/powder disparity yields a sentence that violates the purposes of 3553(a) 'even in a mine run case.'" *Id.*

In child pornography cases, the government routinely relies upon the applicable guideline range as grounds for harsh sentences. But as illustrated above, the guidelines are only advisory and are *one of many factors* for this Court to consider when determining a suitable sentence. Like the crack/powder dichotomy, there is a disparate impact under a rote application of the guidelines even in a mine run child pornography case. To address this disparate impact and to avoid unfair sentences, district courts have increasingly acted with more flexibility in imposing variant sentences in non-production child pornography cases.

## C. The Guidelines in the Child Pornography Context

The Ninth Circuit applied *Kimbrough*'s rational to the child pornography guidelines in *Henderson* and found that:

> The child pornography guidelines are, to a large extent, *not the result of the Commission's exercise of its characteristic institutional role*, which requires that it base its determinations on empirical data and national experience, but of frequent mandatory minimum legislation and specific congressional directions to the Commission to amend the guidelines.

649 F.3d at 962-63 (emphasis added). The Ninth Circuit went on to hold that "district courts may vary from the child pornography guidelines, §2G2.2, based on policy disagreement with them." *Id.* In doing so, it joined many of its sister circuits, which have similarly determined that the child pornography guidelines, as applied to particular defendants, may be unduly harsh. *See*, *e.g.*, *United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010); *United States v. Grober*, 624 F.3d 592 (3d Cir. 2010); *United States v. Maulding*, 624 F.3d 285 (7th Cir. 2010); *United States v. Stone*, 575 F.3d 83 (1st Cir. 2009); *United States v. Morrison*, 771 F.3d 687 (10th Cir. 2014); *United States v. Brooks*, 628 F.3d 791 (6th Cir. 2011); *United States v. Black*, 670 F.3d 877 (8th Cir. 2012).

In *Dorvee*, the Second Circuit went so far as to encourage district judges "to take seriously the broad discretion they possess" when fashioning sentences under §2G2.2 and to keep in mind that "they are dealing with *an eccentric guideline of a*

*highly unusual provenance* which, unless carefully applied, can easily generate unreasonable results." *Dorvee*, 616 F.3d at 188 (emphasis added).[3]  *Dorvee*'s logic is especially impactful in non-production/non-distribution cases such as this, where the offender is entry-level with no other criminal history, who has lived an otherwise prosocial, law-abiding life prior to being arrested.

The Commission has extensively studied §2G2.2 and repeatedly criticized its applicability.   In October 2009, it published THE HISTORY OF CHILD PORNOGRAPHY GUIDELINES, which it later elaborated upon in its 2012 REPORT TO THE CONGRESS: FEDERAL CHILD PORNOGRAPHY OFFENSES, both of which outlined

---

[3]*Dorvee* highlighted just how irrational §2G2.2 can be when applied to non-distribution/non-production child pornography offenders in a powerful yet all-too-predictable illustration:

> Had Dorvee actually engaged in sexual conduct with a minor, his applicable guidelines range could have been considerably lower.  An adult who intentionally seeks out and contacts a twelve-year old on the internet, convinces the child to meet and to cross state lines for the meeting, and then engages in repeated sex with the child, would qualify for a total offense level of 34, resulting in a guideline range of 151 to 188 months in prison for an offender with a criminal history category of I.  Dorvee, who never had any contact with an actual minor, was sentenced by the district court to 233 months of incarceration.  What is highly ironic is that the district court justified the 233-month sentence based on its fear that Dorvee *would* sexually assault a child in the future.

616 F.3d at 187 (emphasis in original).

the irrationality of imposing the guidelines upon first-time offenders such as Mr. Udall. The 2012 report, which resulted from a multi-year study of federal child pornography offenders, specifically determined that the guidelines produced unduly severe results in possessory-only (*i.e.*, non-production and non-distribution) cases. 2012 Report, Executive Summary, ii.

Because Congress has not yet implemented the Commission's statutory or guideline recommendations, §2G2.2 remains largely unchanged, with the enhancements for non-production child pornography offenders still in full force and effect.[4] According to the Commission's 2021 updated report, due to congressional inaction—despite study after study indicating that §2G2.2 is outdated, unfair, and out-of-touch—federal judges have been left with no alternative but to continue to sentence most child pornography offenders below their guideline range, with downward variances imposed in over 60% of all cases.[5]

_____

[4]The recommendations were based on the Commission's findings that the guidelines needed to better account for technological changes, emerging social science research, and variations in offender culpability and sexual dangerousness.

[5]In fiscal year 2020, the number increased to 60.8% of non-production child pornography offenders received a variance below the guideline range, with their average sentence reduced by 38.5%. *See* QUICK FACTS: CHILD PORNOGRAPHY: FY2016 THROUGH FY2020 DATAFILES, United States Sentencing Commission, available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Child_Pornography_FY20.pdf (last accessed Nov. 16, 2022); *see also* FEDERAL SENTENCING OF CHILD PORNOGRAPHY NON-PRODUCTION OFFENSES, United States Sentencing Commission, June 2021, available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-

## D. Application of the Guidelines to the Instant Case

The guideline range in this case is dramatically increased because of the specific offense characteristics relating to computer usage and volume of images, yet these characteristics apply in virtually *every* child pornography case. (Doc. 116 at 3-8.) According to the Commission's 2012 Report:

> Non-production child pornography offenses have become almost *exclusively internet-enabled* crimes; the typical offender today uses modern Internet-based technologies such as peer-to-peer ("P2P") file-sharing programs that were just emerging only a decade ago and that now facilitate large collections of child pornography. The typical offender's collection not only has grown in volume but also contains a wide variety of graphic sexual images (including images of very young victims), which are now *readily available* on the Internet.

2012 Report, Executive Summary at ii-iii (emphasis added). That was in 2012. Those trends have only become even more pronounced today. Indeed, the 2021 Report affirms that at least 95% of child pornography offenders received enhancements for use of a computer and for the age of the victim (images depicting victims under the age of 12), 84% received an enhancement for images depicting sadistic or masochistic conduct or abuse of an infant or toddler, and 77.2% received enhancements for having 600 or more images. Given these stark figures, which have only increased in recent years, it cannot be said that these

publications/2021/20210629_Non-Production-CP.pdf (last accessed Nov. 15, 2022) (hereinafter "2021 Report").

enhancements are premised upon "specific offense characteristics" in a particular case. Rather, they have become near universal traits in modern child pornography cases, which are reflective of technology developments and not the specific intent of the individual offender.

In fiscal year 2019, for example, non-production child pornography offenses involved a median number of 4,265 images, over half of which included images or videos of infants or toddlers, and nearly every offense—*99.4%*—included prepubescent victims. The Commission attributes these figures to "advancements in digital and mobile technology," and not necessarily to the offender's particular interest in such images. *See* 2021 Report at 4. This is certainly true of Mr. Udall, as his case involved only images from the LS Models series which is relatively benign when compared to most other child pornography content.

Section 2G2.2 was originally promulgated when the internet was still emerging and home computers were far less ubiquitous. Indeed, most of the current enhancements—which were derived from previous iterations—were drafted at a time when offenders still collected child pornography in hard copy form through the mail and in adult bookstores. *See* 2012 Report, Ch. 1 at 6 & Ch. 6 at 125-26 (Table 6-2, noting current versions of five of the six current enhancements in the non-production guidelines originally promulgated in 1987 and 1991). As a result of newer technologies and broadband internet speeds, however,

entry-level offenders like Mr. Udall now routinely acquire large swaths of child pornography, quite literally with the "click of a mouse," and in a matter of mere seconds. For these reasons, as well as the arguments outlined in Mr. Udall's objections to the draft PSR (Doc. 24), the sentencing scheme set forth under §2G2.2 is unjust, irrational, and fails to distinguish between real world offenders based on their relative degrees of actual culpability. This Court has the plenary authority to reject the guidelines outright, *Henderson*, 649 F.3d at 962-63, and should do so here.

Sentencing data compiled by the Sentencing Commission since 2009 indicates that there has been a steady increase in sentences that depart or vary below the guidelines range in non-production child pornography cases. The rate of within-guideline sentences decreased from 83.2 percent in fiscal year 2004—the last full year before *Booker*, when most offenders were not yet subjected to the increased statutorily-mandated and guideline-mandated penalties resulting from the PROTECT Act—to just 32.7 percent in fiscal year 2011. The corresponding rate of below-guideline sentences has increased even more drastically: by fiscal year 2011, 62.8 percent of all child pornography sentences were below the guideline range. The data strongly suggests §2G2.2's sentencing scheme does not "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough*, 522 U.S. at 109. Thus, pursuant to *Kimbrough*, *Henderson*, and §

3553(a), this Court should impose a variant sentence because §2G2.2 is not the best measurement tool to effectively gauge the appropriate sentence.

**E. Applying § 3553(a) Factors to the Instant Case**

Section 3553(a) requires the Court to craft a sentence that is "sufficient but not greater than necessary" under the circumstances. The draft PSR correctly recognizes that, based on the facts and circumstances presented, Mr. Udall's sentence warrants considerable variance from the guidelines. But a 36-month sentence is still excessive here because it fails to adequately account for Mr. Udall's specific personal and offense characteristics.

The Commission's 2021 Report identifies three aggravating behaviors of non-production child pornography offenders, none of which apply to Mr. Udall. The aggravating factors are based on: (1) Content; (2) Community; and (3) Conduct. Not a single one is implicated in this case.

*Content* refers to an offender's child pornography collection and the nature of his collecting behavior. *See* 2021 Report at 29-35. Mr. Udall's entire "collection" consisted of LS Models images, which he deleted on his own initiative because the images made him feel guilty.

*Community* examines the offender's degree of involvement with others in an online community devoted to child pornography and sexual exploitation. *See* 2021 Report at 36-38. Mr. Udall had zero involvement in any such community. Mr.

Udall did not collect online literature describing child pornography, participate in chat forums discussing sexual exploitation of children, subscribe to electronic magazines, books or drawings of child pornography, etc.

*Conduct* looks at the offender's engagement in sexual abuse or exploitative conduct. *See* 2021 Report at 39-46. Mr. Udall has *never* engaged in such behavior. The outright absence of any aggravating factors recently identified by the Commission provides further support that the requested variant sentence is appropriate.

### F. Personal History, Background, and Characteristics

The Supreme Court has instructed that the defendant's personal background and history are essential to a district court's calculation of an individualized sentence. *See Gall*, 522 U.S. at 52 (sentencing judge must consider every convicted person as an individual and every case as a unique study in human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue); *see also* 18 U.S.C. § 3553(a)(1). As described above, Mr. Udall was born and raised in rural Arizona and is a devout Mormon. He grew up isolated and inexperienced, and allowed himself as an adult to become lost in the dark corners of the internet. A variance from the guideline range is recommended, as Mr. Udall has expressed remorse, shame, and embarrassment for his actions and understands how they caused harm to the child victims. He has accepted responsibility and

does not make excuses for his conduct. Additionally, he has a strong prosocial support system in place with his family. He has many members of the community in Eastern Arizona standing behind him. He has no substance abuse issues and has maintained stable employment his entire adult life. He has clear goals and ambition for the future. Mr. Udall's letter to the Court further demonstrates his level of remorse and insight.

### G. Military Service & Employment-Related Contributions

Under USSG §5H1.11, military service is relevant in determining whether a departure is warranted if the military service is "present to an unusual degree and distinguishes the case from the typical case covered by the guidelines." *Porter v. McCollum*, 558 U.S. 30, 43 (2009) ("Our Nation has a long tradition of according leniency to veterans in recognition of their service, especially those who fought on the front lives as [defendant] did."). Likewise, the guideline itself provides that departure may also be warranted based on public service and other employment-related contributions to society. *United States v. Canova*, 412 F.4d 331 (2d Cir. 2005) (affirming downward departure for ex-Marine who had worked as volunteer firefighter); *United States v. Huber*, 462 F.3d 945 (8th Cir. 2006). While Mr. Udall is ineligible for the departure, given the nature of his offense, this Court can and should still consider his career in USMC and past employment as a police officer as grounds for variance under § 3553(a).

Mr. Udall has dedicated much of his life to serving his country.  As noted above, he enlisted in USMC at 21 years old and served in the Iraq War on the front lines, during which he received many commendations for his distinguished service. (Ex. A.)  He then worked as a police officer for several years.  Numerous awards, certifications, and documentation have been attached for the Court's review, all of which praise Mr. Udall's dedication and professionalism.

## IV.  SENTENCING RECOMMENDATION

Viewing child pornography is undoubtedly a serious crime.  But no matter how revolting the concept of child pornography is to our society at-large, harsh punishment cannot be the sole driving force at sentencing, because "it is not *severe* punishment that promotes respect for the law, it is *appropriate* punishment." *United States v. Olhovsky*, 562 F.3d 530, 552 (3d Cir. 2009) (emphasis in original); *see also United States v. Goff*, 501 F.3d 250, 260 (3d Cir. 2007) ("child pornography is so odious, so obviously at odds with common decency, that there is a real risk that offenders will be subjected to indiscriminate punishment based solely on the repugnance of the crime and in disregard" of other appropriate sentencing considerations).

The requested sentence is not insignificant.   Twenty-four months imprisonment followed by lifetime supervised release with sex offender conditions and mandatory registration is incredibly onerous and will last the rest of Mr.

Udall's natural life. He will forever be required to undergo significant counseling and monitoring and will live with the stigma of sex offender registration. *Cf. Lawrence v. Texas*, 539 U.S. 558, 575 (2003) (recognizing that "stigma" imposed for violation of sex crime statute "is not trivial"); *see also* Model Penal Code: Sexual Assault and Related Offenses, General Commentary at 12 (Am. Law. Inst., Discussion Draft No. 2, 2015) ("[T]he treatment of sex offenders has borne many of the hallmarks of an unjustifiably punitive state. For instance, sex offenders as a class have been subjected to some of the most unforgiving and indiscriminate collateral consequences of conviction, such as unduly severe residency restrictions or registration requirements.").

Imprisonment beyond 24 months is unnecessary to achieve the goals of sentencing in this case. Mr. Udall poses no risk to the community, presents a low risk to reoffend, is non-dangerous, and will have much better access to high quality treatment on the outside. *See* USSG §5C1.1, cmt. n.6 (justifying community confinement if defendant's criminality can be better addressed through treatment in community rather than prison). And Mr. Udall has already demonstrated that he *can* succeed under supervision, as he has performed extremely well on strict Adam Walsh Act conditions while on PTS pending sentencing.

Even before law enforcement became involved, Mr. Udall recognized that his use of child pornography was unacceptable and deleted it all from his

computer. He pled guilty at the very earliest opportunity even though his case was triable and conviction was by no means guaranteed for the government. But Mr. Udall pled guilty because he knew he had wronged and wanted to own up to it. In doing so, he also saved the government and this Court from having to expend tremendous resources on this case.

In the nearly four years that have passed since his first contact with HSI, Mr. Udall has led a completely law-abiding lifestyle and has never returned to viewing child pornography (or indeed any pornography for that matter). He has never engaged in sexual activity with a child and is not sexually attracted to children. He is a good candidate for supervision and treatment and can be managed safely without the need for incarceration beyond the minimum term available under the plea agreement. *See* USSG §5C1.1, cmt. n.6 (justifying community confinement if defendant's criminality is related to treatment concern that can better be addressed in community rather than prison).

Accordingly, upon being released from prison, treatment and supervised release with sex offender conditions will sufficiently ensure that Mr. Udall continues to live a law-abiding lifestyle in the future. He will *never* view child pornography or use the internet irresponsibly again; he is keenly aware that if he were to ever do so, he would go to prison for a very long time. What Mr. Udall

needs is prolonged *rehabilitation*, not prolonged incarceration.[6] *Cf. United States v. Autrey*, 555 F.3d 864, 877 (9th Cir. 2009) (solitary goal of § 3553(a)(2)(D) is to rehabilitate, not punish).

In *Autrey*, the Ninth Circuit upheld the substantive reasonableness of a sentence of probation for possessing child pornography.[7] There, the district court

---

[6]In its 2012 Report, the Commission concluded that "emerging research on the effectiveness of psychosexual treatment administered as part of the containment model involves close cooperation among the treatment provider, a polygraph examiner, and a qualified probation officer or other supervising officer." 2012 Report, Ch. 10, at 319, *discussing* EVALUATION AND TREATMENT OF CHILD PORNOGRAPHY OFFENDERS' SEXUAL DISORDER. Evidence-based research demonstrates that treatment—even in lieu of incarceration—is an adequate means to protect the public.

[7]Federal courts nationwide are increasingly turning to non-custodial sentences for possessory child pornography offenses. *See*, *e.g.*, *United States v. E.L.*, 188 F.Supp.3d 152 (E.D.N.Y. 2016) (five-year probation term was appropriate sentence for possession of child pornography); *United States v. R.V.*, 157 F.Supp.3d 207, 267-68 (E.D.N.Y. 2016) (imposing sentence of seven years supervised release); *United States v. D.M.*, 942 F.Supp.2d 327, 352 (E.D.N.Y. 2013) (imposing five years' probation); *United States v. Stall*, 581 F.3d 276, 277-78 (6th Cir. 2009) (affirming non-guidelines sentence of one day incarceration followed by ten-year period of supervised release); *United States v. Prisel*, 316 Fed. App'x 377, 378 (6th Cir. 2008) (affirming non-guidelines sentence of one day in custody followed by 18-months of house arrest); *United States v. Rowan*, 530 F.3d 379, 380 (5th Cir. 2008) (affirming non-guidelines sentence of five years of probation); *United States v. Polito*, 215 Fed. App'x 354, 355 (5th Cir. 2007) (per curiam) (affirming sentence of five years' probation with one-year house arrest); *United States v. Crespo-Rios*, No. 08-CR-208, 2015 WL 6394256 at *1 (D.P.R. 2015) (holding "that resentencing defendant to the same sentence—that is, time served followed by a long period of supervised release—is justified" under § 3553); *United States v. Mallatt*, No. 13-CR-3005, 2013 WL 6196946 at *13 (D. Neb. 2013) ("sentence of time served followed by six years of supervision with special conditions including intensive treatment is adequate to fulfil the goals of

had carefully considered each of the § 3553 factors, one of which was finding that the defendant would be better served by treatment in the community. The Ninth Circuit affirmed the district court's express finding that a sentence of probation adequately reflected the seriousness of the offense, respect for the law, and just punishment because of the onerousness of the sex offender conditions imposed.[8] 555 F.3d at 875. The *Autrey* Court found that adequate deterrence, as contemplated under § 3553(a)(2)(B) can be found in the district court's ability to impose additional prison time upon revocation, if needed, in the future. *Id.* at 876. Finally, *Autrey* held that the public was adequately protected by probationary supervision of the defendant, the ability to impose lengthy prison time if there was ever any non-compliance with supervision, and his registration as a sex offender. *Id.* Each of those factors apply here to similarly protect the public.

Mr. Udall has demonstrated he can be a productive, well-respected member of society. This is his first fall into the criminal justice system. It will also be his

---

sentencing in this case."); *United States v. Diaz*, 720 F.Supp.2d 1039, 1048 (E.D. Wis. 2010) (imposing 30 years of supervised release); *United States v. Boyden*, No. 06-CR-20243, 2007 WL 1725402 at *10 (E. D. Mich. 2007) (one-day confinement followed by three years supervised release); *United States v. Evren*, No. 10-CR-131 (E.D.N.Y. 2013) (three years' probation); *see also United States v. Morace*, 594 F.3d 340, 351 n.10 (4th Cir. 2010) (noting "that some district courts have begun sentencing defendants convicted of possessing child pornography to one day of incarceration followed by a term of supervised release").

[8]The sex offender conditions discussed in *Autrey* are essentially the same as the supervised release conditions recommended by the PSR in this case.

last.  He has done especially well in the time since the instant offense was committed; he has worked to reform himself and has grown tremendously as a person.  He poses no real risk to society from this point forward and is a suitable candidate for rehabilitation.

For these reasons, a sentence of **24 months imprisonment followed by lifetime supervised release** with sex offender conditions is respectfully recommended.  This sentence is appropriate under the circumstances and sufficient but not greater than necessary under 18 U.S.C. § 3553.

RESPECTFULLY SUBMITTED this 16th day of November, 2022.


Law Office of
**HERNANDEZ & HAMILTON, PC**

*s/Joshua F. Hamilton*
JOSHUA F. HAMILTON
Attorney for Defendant

# **CERTIFICATE OF SERVICE**

I, Julie Padilla, do hereby certify that on this 16th day of November, 2022, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing, and transmittal of a Notice of Electronic Filing was sent to the following recipients:

The Honorable Rosemary Marquez
United States District Court

Carin C. Duryee, Assistant
United States Attorney's Office

Brett M. Wrons, Senior Officer
United States Probation Office

By *s/Julie Padilla*
    JULIE PADILLA